**SCM CORPORATION,**
**Plaintiff-Appellant,**

v.

**XEROX CORPORATION,**
**Defendant-Appellee.**

No. 14, Docket 79–7017.

United States Court of Appeals,
Second Circuit.

Argued Sept. 17, 1980.

Decided March 12, 1981.

Gordon B. Spivack, New York City (David H. Marks, Jonathan M. Jacobson, Stephen R. Lynch, Lord, Day & Lord, New York City, Ira B. Grudberg, David L. Belt, Jacobs, Jacobs & Grudberg, P. C., New Haven, Conn., Jerome Gotkin, W. Thomas Fagan, Widett, Slater & Goldman, P. C., Boston, Mass., Bernard J. Nussbaum, Harold C. Hirshman, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., of counsel), for plaintiff-appellant.

Stanley D. Robinson, New York City (Milton Handler, Michael Malina, Allen Kezsbom, Gerald Sobel, Randolph S. Sherman, Kaye, Scholer, Fierman, Hays & Handler, New York City, Robert S. Banks, Xerox Corporation, Stamford, Conn., of counsel), for defendant-appellee.

Before WATERMAN, FRIENDLY and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

The plaintiff, SCM Corporation (SCM), appeals from an order entered in the United States District Court for the District of Connecticut, Jon O. Newman, *Judge*, dismissing its claim for monetary damages asserted in this private antitrust action for injuries sustained as a result of alleged exclusionary acts committed by the defendant, Xerox Corporation (Xerox), in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1976), and § 7 of the Clayton Act, 15 U.S.C. § 18 (1976). The trebled amount of damages calculated by the jury on this claim totalled $111.3 million. The principal anticompetitive acts alleged by SCM concerned patent acquisitions made by Xerox. SCM averred that Xerox's acquisition of certain patents and subsequent refusal to license those patents excluded SCM from competing effectively in a relevant product market and submarket dominated by Xerox products that embraced the patented art. Judge Newman ruled below that a need to accommodate the antitrust and patent laws precluded damage liability predicated upon Xerox's refusal to license its patents; however, he left open the possibility of granting the plaintiff equitable relief. Judge Newman certified his order for interlocutory review pursuant to 28 U.S.C. § 1292(b) (1976) and, as developed below, we exercised our discretion under that section to accept this appeal. Without commenting upon Judge Newman's remedial theory, we affirm the denial of monetary damages in connection with SCM's exclusionary claim based upon our determination that none of Xerox's patent-related conduct, the only conduct alleged by SCM to have caused it any harm, contributed to any antitrust violation.

SCM also appeals from a judgment entered pursuant to Rule 54(b), 28 U.S.C., Fed.R.Civ.P. 54(b) (1976), dismissing its claim for monetary damages based upon injuries sustained as a result of certain marketing programs it alleged violated § 2 of the Sherman Act and § 3 of the Clayton Act, 15 U.S.C. § 14 (1976). Judge Newman held that this claim could not support an award of damages because "the jury [had

not been] given a rational basis for approximating" the damages incurred by SCM. 463 F.Supp. 983, 1019. We affirm Judge Newman's decision.

## BACKGROUND

### *Chester Carlson—The Inventor*

In the 1930s, a patent attorney turned inventor, named Chester Carlson, invented a process, subsequently called xerography, that within two decades would revolutionize the document reproduction industry. The xerographic process is described in Judge Newman's opinion below, reported at 463 F.Supp. 983.

Two adaptations of the xerographic process are particularly relevant to this case. The first is electrofax copying, a process which involves the reproduction of images on paper coated with zinc-oxide. The second, xerography in the reusable mode, is a more complex process which permits images to be reproduced on plain paper.

The significance in distinguishing between coated-paper copying and plain-paper copying is that Xerox, which later came to control Carlson's patents and all of the xerographic improvement patents, agreed to grant licenses for coated-paper copying but refused to grant licenses for plain-paper copying. The result was that from 1960 until 1970, when IBM introduced its first plain-paper copier, Xerox enjoyed an absolute monopoly in the plain-paper copying segment of the industry.

Both the plain- and coated-paper copiers were introduced into a market that formerly had been limited to machines that employed "duplicating" processes as opposed to the "copying" processes just described. The principal duplicating processes then in use were offset, spirit, and mimeograph, all of which were developed around the turn of the century. The duplicating processes all had one common characteristic—they required the preparation of a master or stencil. Ultimately the copying machines formed a discrete market in which the duplicating machines could not effectively

compete; however, precisely when that even occurred was not determined by the jury below.

## The Carlson-Battelle Relationship

Chester Carlson, from 1940 to 1944, made eighteen attempts to find a commercial backer for his invention. Carlson was turned down by IBM on three separate occasions, two of which involved an offer by Carlson to sell exclusive rights to all of his patents. Finally, in 1944, Carlson entered into an agreement with Battelle Memorial Institute (Battelle), a non-profit research organization self-described as "in the business of developing and improving technical inventions and in selling the rights thereon when patented." Pursuant to this agreement, Battelle received an exclusive license under Carlson's patents; a wholly owned subsidiary, Battelle Development Corp. was designated as Carlson's exclusive licensing agent; and Battelle agreed to pay Carlson forty percent of any royalties it might receive. Subsequently, Carlson formally assigned his patents to Battelle. Thereafter, Battelle secured patents covering many improvements it invented in the xerographic process that would prove to be of vital importance to the production of an automatic plain-paper copier.

## The Xerox-Battelle Agreements

Between 1944 and 1947 Battelle experienced difficulty, as had Carlson, in its efforts to secure financial backing. Carlson and Battelle approached thirty-six companies, including IBM, but none was sufficiently interested. In 1946 the Haloid Company of Rochester, New York (later renamed and hereinafter referred to as Xerox) approached Battelle and offered its assistance in the commercialization of xerography. During the next ten years, the parties entered into a series of four basic agreements pursuant to which Xerox acquired complete title to the Carlson-Battelle patents and exclusive domain over the plain-paper copying industry. We describe these agreements in some detail.

The first agreement between Xerox and Battelle, executed in 1947, denied Xerox the exclusive license it sought and instead gave it a *non-exclusive* license covering limited applications of xerography. Xerox agreed to pay Battelle an eight percent royalty and to sponsor $25,000 of xerographic research at Battelle a year. The license was limited to patented inventions that would produce up to twenty copies of a document. Xerox also agreed to grant back to Battelle royalty-free rights on any xerographic patents it might obtain in connection with its own or sponsored research. Finally, Battelle agreed, as was its usual practice, not to work for another company in the xerographic field occupied by Xerox for the term of the agreement.

The second agreement, executed in 1948, granted Xerox an *exclusive* license to the Carlson-Battelle patents, on the condition that Xerox "use diligent efforts to secure sublicensees to engage in research, development and commercialization of the inventions and patents" involved. Additionally, the 20-copy limitation was removed from the license agreement, affording Xerox more latitude in its efforts to exploit the commercial potential of xerography.

The third agreement, executed in 1951, continued Xerox's obligation to use diligent efforts to seek sublicensees, but extended the scope of the license, which under the 1947 and 1948 agreements had been limited to use in the United States, to include use worldwide. Additionally, all remaining limitations on the fields in which Xerox could practice xerography under the 1948 agreement were removed.

Before discussing the fourth agreement executed by the parties in 1956, which is central to SCM's claims in this case, it is necessary to describe the circumstances of the parties and the market at that time. By the early 1950s Xerox had experienced success in two commercial applications of xerography. One machine, a flat-plate copier, which required twenty manual steps and three or four minutes to produce a single copy, found some market acceptance for preparing paper masters for offset duplicators. Another machine, the "Copyflo," a huge machine weighing approximately one ton, achieved substantial success in

printing microfilm. By 1956, Xerox was deriving forty percent of its profit from its xerographic products. SCM does not contend that either of these products found commercial acceptance as convenience office copiers, the product market that SCM claims Xerox dominated for over a decade. Nevertheless, there is evidence in the record tending to prove that Xerox possessed the technology in 1955 to manufacture an automatic plain-paper copier, and that Xerox speculated that the value of even a non-exclusive license of its xerographic patents was worth $70 million. Despite its continuing obligation under the 1948 and 1951 agreements to secure sublicensees, Xerox turned down license requests from such potential competitors as IBM, which by then apparently had formed a different opinion concerning the commercial feasibility of xerography. Although the record is not clear, it appears that coated-paper copiers, other than the electrofax (xerographic), had made inroads into the document reproduction machine industry by the early 1950s. These coated-paper copiers included a "wet" photographic type process called "diffusion transfer," marketed by Apeco, another "wet" process called "dye transfer," advanced by Kodak, and a "dry" thermographic process that used heat-sensitive coated paper manufactured by 3M. In 1954 RCA introduced its electrofax machine and attempted to obtain xerographic licenses from Xerox. Also in this document reproduction industry in 1956 were the offset,

mimeograph, and spirit machines that by then had been in use for half a century. (SCM Br. 18–19).[1] It was in this context that Xerox entered into its final agreement with Battelle.

The fourth agreement, executed in 1956, transferred title to the four basic Carlson-Battelle patents to Xerox and abrogated Xerox's sublicensing obligation. In return, Battelle received 55,000 shares of Xerox stock and a percentage of Xerox's profits between 1959 and 1965.[2] Xerox also received an exclusive license to the remaining Carlson-Battelle patents, title formally to be assigned on January 1, 1959. Additionally, Xerox received the right to receive all future xerographic patents and know-how developed by Battelle, provided that Xerox continued to sponsor research in the amount of $25,000 annually. Finally, the 1956 agreement eliminated Xerox's obligation to assign its own internally developed patents to Battelle.[3] On January 2, 1959, the assignment from Battelle to Xerox of the xerographic improvement patents occurred pursuant to the terms of the agreement entered into between the parties in 1956.

### Xerox's International Family of Companies

In 1956 Xerox entered into a joint venture with the Rank Organisation, a British company, to assist in the commercial exploitation of xerography everywhere except the United States and Canada. The agreement created Rank Xerox, a joint venture. The

1. SCM did not attempt to define the composition of the relevant product market in 1956, because SCM did not allege that Xerox's conduct at this time was directed at monopolizing the relevant product market then in existence. The relevant product market, which SCM claimed Xerox monopolized by 1964, allegedly consisted only of plain- and coated-paper copiers, and was described as the convenience office copier market. SCM also argued that plain-paper copiers by 1964 formed a relevant submarket over which Xerox acquired monopoly control. Xerox on the other hand argued that the relevant product market included offset, spirit, and mimeograph equipment. In any event, the jury found the markets suggested by SCM existed in 1969 but *not* in 1964. In view of SCM's failure to challenge the jury's determination on appeal, we see no reason to disturb the jury's finding that the relevant product

market and submarket SCM defined did not exist in 1964.

Thus, we have no clear picture of the relevant product market that existed in 1956 when Xerox entered into its final agreement with Battelle that SCM claims violated the antitrust laws.

2. Chester Carlson received 40% of the consideration given Battelle.

3. In September 1956, Xerox also entered into an agreement with another research organization named Horizons, Inc. Under the agreement, Horizons granted Xerox non-exclusive licenses under xerographic patents it had obtained and, like Battelle, agreed to perform xerographic research exclusively for Xerox. The agreement was renewed in 1960.

agreement included a clause obligating the joint venture to grant Xerox exclusive rights in the United States and Canada to improvement patents it might obtain.[4] The jury found that Rank was not a potential competitor of Xerox. In any event there was no agreement that Rank Xerox would not compete against Xerox in the United States.

In 1960, Rank Xerox formed a separate joint venture with Fuji Photo Film, a Japanese enterprise. The jury found that Fuji Photo Film was a potential competitor of Xerox and Rank Xerox. The agreement created Fuji Xerox. This agreement also contained a grant-back clause that entitled Xerox to exclusive rights in all countries except Japan and eight Asian nations to all inventions Fuji Xerox might make in the xerographic field. There was no agreement preventing Fuji Xerox from competing with Xerox in the United States; however, Fuji Xerox was not licensed under Xerox's patents in the United States and thus could not compete in this country in the alleged plain-paper copier submarket without infringing Xerox's patents here.

In 1969, Xerox purchased an additional one percent of Rank Xerox's stock, increasing its stock ownership in the joint venture to fifty-one percent. Additionally, the grant-back clause of the joint venture agreement was eliminated.

*Xerox Introduces the 914*

In March 1960, Xerox made initial deliveries of the 914, its first automatic plain-paper copier. The 914 was a resounding success. Between 1960 and 1970, Xerox's revenues rose from $47 million to $1.7 billion; during the same period its gross profits increased from $6 million to $400 million. By 1975 Xerox's revenues reached $4 billion and its gross profits rose to over $800 million.

Xerox enjoyed a complete monopoly in the production of plain-paper copiers between 1960 and 1970. In 1960 SCM introduced a coated-paper copier that employed a diffusion transfer process. In 1962 SCM

produced an electrofax coated-paper copier, which infringed some of Xerox's patents. Following a brief infringement suit, Xerox in 1964 granted SCM limited licenses under its patents to manufacture xerographic coated-paper copiers. Xerox refused, however, to extend licenses to SCM that would enable it to manufacture its own plain-paper copier. Similar requests were made by SCM in the ensuing years but repeatedly denied by Xerox. Finally, in 1970, without obtaining licenses from Xerox, IBM introduced a plain-paper copier into the market; other companies followed IBM's lead in the early seventies.

*Additional Alleged Anticompetitive Conduct of Xerox*

a. *Employee Covenants Not to Compete*

Up until 1970, Xerox imposed upon its employees an employment condition that in the event they terminated their employment with Xerox, they could not work for a competitor for a period of two years. At Xerox's request, Battelle imposed a similar restriction on six of its employees. SCM presented no evidence that it ever attempted to hire a Xerox or Battelle employee covered by such a restrictive covenant.

b. *MUP and XCP Pricing Plans*

In the 1960s Xerox's only real competition was in the "low volume" copier market, a market in which coated-paper copiers could compete because of their relative cost efficiency at the low-volume usage level. Around 1967 several manufacturers of coated-paper copiers instituted "volume" or "fleet" pricing plans under which subscribing customers received discounts based upon the aggregate volume of copies made on all machines used by the customer.

In 1968 Xerox responded with its own volume pricing plan entitled the "Machine Utilization Plan" (MUP). MUP afforded to Xerox customers a discount based upon the customer's total volume from both low-volume (an area in which coated-paper copiers could compete) and high-volume machines (an area in which coated-paper copiers could

---

**4.** Xerox received only one grant-back patent which it used in a commercial product.

not effectively compete). The MUP plan was replaced by a similar program, the XCP plan, in 1975. SCM argued that MUP constituted an illegal tying arrangement that coerced Xerox customers to use Xerox low-volume machines instead of competitors' low-volume copiers to meet minimum volume levels to be eligible for MUP discounts.

*The Federal Trade Commission (FTC) Proceeding*

In January 1973 the FTC filed a complaint against Xerox charging that the company's conduct had violated § 2 of the Sherman Act. The FTC sought a decree enjoining Xerox to license its patents and to sever its relationship with its affiliated companies. The action was terminated upon the entry of a consent decree on July 29, 1975 under which Xerox agreed to license all of its patents in exchange for nominal royalties and grant-backs of non-exclusive licenses under all xerographic patents owned by licensees. Thus, as of July 29, 1975, Xerox's patents no longer excluded a potential competitor from the market.

*SCM's Claims and the Decision Below*

SCM filed its complaint in this action on July 31, 1973. Discovery was completed in 1977 and the trial terminated in 1978 following 215 days in which evidence was presented and 38 days of jury deliberation. SCM asserted five claims for monetary damages at trial. *See* 463 F.Supp. at 986–91. Only two of those claims have been pursued on this appeal.

### a. *The 1969 Exclusion Claim*

The gist of SCM's 1969 exclusion claim [5] is that by 1969 Xerox had willfully acquired monopoly power in a relevant product market consisting of convenience office copiers using plain and coated paper and in a relevant submarket consisting only of plain-paper copiers, and that Xerox's conduct excluded SCM from the relevant market and submarket.

The jury rejected SCM's argument that the relevant product market and submarket defined by SCM existed in 1964, but accepted the contention that the market and submarket so defined existed in 1969. The jury made a specific finding that the only patent-related conduct of Xerox causally related to SCM's claimed injuries under its 1969 exclusion claim was the 1956 Xerox-Battelle agreement. The 1956 agreement, therefore, is the only basis upon which SCM can recover any monetary damages under its 1969 exclusion claims. As Judge Newman noted below:

> SCM cannot predicate damage liability on any nonpatent-related conduct because it neither claimed nor offered evidence that any non-patent-related conduct because it covenants, for example, caused it any damage. SCM's entire exclusion damage proof consisted of the losses suffered by lack of licenses.

463 F.Supp. at 1010.

The jury found that the 1956 agreement constituted an unreasonable restraint of trade in 1964 and 1969 in violation of § 1 of

**5.** SCM originally sought to recover damages for financial injuries it sustained as far back as 1964, the year SCM first requested a license from Xerox to manufacture its own plain-paper copier.

Since the complaint was filed on July 31, 1973, the period of injury for which recovery could be sought ordinarily would be governed by the four-year statute of limitations provided under the antitrust laws, 15 U.S.C. § 15b (1976), and extend back only to July 31, 1969. Because the FTC instituted a proceeding against Xerox on January 16, 1973, § 16(i) of Title 15 of the United States Code, which tolls the normal statute of limitations upon the commencement of an FTC proceeding, extended the period back to January 16, 1969. Finally, Xe-

rox did not object to including the first two weeks of January, so that January 1, 1969 became the outside date.

SCM asserted, nevertheless, that its injuries sustained in 1964 were not ascertainable until the FTC proceeding was commenced in 1969 and that, therefore, it was entitled to recovery for losses sustained in 1964. Because of the statute of limitations question, SCM's claim for damages prior to 1969 was characterized as a distinct claim—the "1964 Exclusion Claim"—to avoid confusion. SCM has not pursued its 1964 exclusion claim on this appeal because the jury found that SCM lacked the intent, preparedness, and capacity to enter into plain-paper copying in 1964. Thus, we need not address the statute of limitations issue.

the Sherman Act,[6] and had the probable effect of substantially lessening competition or tending to create a monopoly in 1969 in both the convenience office copier market and the plain-paper copier submarket in violation of § 7 of the Clayton Act.

Upon all of the evidence of Xerox's alleged anti-competitive conduct, the jury concluded that as of 1969 Xerox willfully acquired or maintained monopoly power in the relevant product market and submarket in violation of § 2 of the Sherman Act.[7] The jury calculated SCM's damages under the 1969 exclusion claim at $11.5 million in lost profits and $25.6 million in lost going concern value. Trebled, the damages amount to $111.3 million. The jury found, however, that SCM reasonably could have avoided all of the 1969 exclusion claim damages by instituting this action against Xerox earlier.[8]

Judge Newman seriously questioned whether any of Xerox's conduct had violated any of the antitrust laws. Judge Newman, however, chose not to disturb the jury verdicts. Instead, the district court ruled, as a matter of law, that Xerox's unilateral refusal to license its patents was not a basis for a monetary damage award. 463 F.Supp. at 1014–15. Judge Newman opined that this result was necessary in order to accommodate the antitrust and patent laws. *Id.* He certified his order denying monetary damages under the 1969 exclusion claim for appeal pursuant to 28 U.S.C. § 1292(b) (1976). 463 F.Supp. at 1021. After remanding the case for further clarification, *see* 599 F.2d 32, and the district

court's restatement of the question certified for interlocutory review, *see* 474 F.Supp. 589, we exercised our discretionary power by an order dated May 25, 1979, to accept this interlocutory appeal.

### b. The MUP Claim

The jury concluded that Xerox's MUP constituted an illegal tying arrangement that violated § 3 of the Clayton Act, 15 U.S.C. § 14 (1976), as well as an effort by Xerox to maintain its monopoly power in the relevant market and submarket in violation of § 2 of the Sherman Act, 15 U.S.C. § 2 (1976). The jury awarded $230,874 to SCM for injuries it sustained as a result of MUP. Judge Newman set aside the jury's verdict under the MUP claim on the ground that the "jury was not given a sufficient basis from which it could reasonably conclude that the lost profits claimed by SCM were caused by MUP." 463 F.Supp. at 1018. The route to appellate review of the disposition of the MUP claim was found through the entry of a final judgment on that claim pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

## DISCUSSION

### The 1969 Exclusion Claim

SCM argues on this appeal that the economic monopoly Xerox achieved through the patents it obtained from Battelle in 1956 was unlawful. The issue presented on this appeal in connection with SCM's 1969 exclusion claim, however, is not whether any of Xerox's conduct between 1947 (when

---

6. The jury rejected SCM's claim that Xerox had entered into a concerted refusal to deal with Rank Xerox and Fuji Xerox aimed at excluding competitors from manufacturing plain-paper copiers worldwide as of 1964 or 1969.

7. While only Xerox's patent-related conduct was alleged by SCM to have caused it any injury, the jury's finding that Xerox monopolized the relevant market and submarket in 1969 in violation of § 2 of the Sherman Act must be presumed to have been based upon the evidence offered by SCM against Xerox concerning both Xerox's patent-related and non-patent-related conduct. The latter category could include the Horizons Corporation patent acquisition, the grant-backs of licenses from

Xerox's licensees, the employee covenants not to compete, and the joint venture agreements entered into between Xerox and the Rank Organisation and Fuji Photo. As Judge Newman observed below, however, it is likely that the jury primarily relied upon the 1956 Xerox-Battelle agreement as the basis for its § 2 violation finding. *See* 463 F.Supp. at 1008.

8. Although we seriously question the appropriateness of applying the avoidable consequences doctrine to a case such as the one before us, we need not resolve that issue in light of our holding that the conduct complained of by SCM did not violate the antitrust laws.

it first contacted Battelle) until 1975 (when Xerox agreed voluntarily to license all of its patents) violated any of the antitrust laws, but rather, whether any of Xerox's conduct during that period caused Xerox to incur damage liability under the antitrust laws to SCM. SCM's damage claim must be predicated upon an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *accord, Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9, 89 S.Ct. 1562, 1571 n.9, 23 L.Ed.2d 129 (1969); *see* Areeda, *Antitrust Violations Without Damage Recoveries*, 89 Harv.L.Rev. 1127, 1130–37 (1976). SCM did not contend below that it sustained any injuries other than by reason of Xerox's allegedly unlawful patent-related conduct, and the jury identified the 1956 agreement as the sole patent-related conduct that caused SCM any harm. Therefore, only if Xerox's procurement of the patents under the 1956 agreement contributed to an antitrust violation can SCM recover damages under its 1969 exclusion claim.

SCM has argued that Xerox's acquisition of its patents and subsequent exercise of the exclusionary power in them violated the antitrust laws and injured SCM. Xerox contends that its acquisition of the patents was lawful and its decision not to license its patents for plain-paper copying constituted a lawful exercise of patent power. Xerox does not dispute that it achieved monopoly power in the relevant market and submarket by 1969, but contends that an examination of the circumstances under which this feat was accomplished reveals the lawfulness of the monopoly it attained. Our analysis commences with a review of the relationship between the patent and antitrust laws.

## I.

The patent laws were enacted pursuant to Congress' authority to "promote the Progress of Science and useful Arts, by securing for limited Times to ... Inventors the exclusive Right to their ... Discoveries." U.S.Const., Art. I, § 8, cl. 8. That the first patent laws were enacted at the second session of our first Congress manifests the importance our founding fathers attached to encouraging inventive genius, a resource that proved to be bountiful throughout this nation's history. The patent laws reward the inventor with the power to exclude others from exploiting his invention for a period of seventeen years. 35 U.S.C. § 154 (1976). In return, the public benefits from the disclosure of inventions, the entrance into the market of valuable products whose invention might have been delayed but for the incentives provided by the patent laws, and the increased competition the patented product creates in the marketplace. The antitrust laws, on the other hand, were enacted to protect competition in the market. The antitrust laws are based upon the fundamental premise that the public benefits most from a competitive marketplace. *Standard Oil Co. v. United States*, 221 U.S. 1, 58, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911); *United States v. Aluminum Co. of America*, 148 F.2d 416, 428–29 (2d Cir. 1945).

The conflict between the antitrust and patent laws arises in the methods they embrace that were designed to achieve reciprocal goals. While the antitrust laws proscribe unreasonable restraints of competition, the patent laws reward the inventor with a temporary monopoly that insulates him from competitive exploitation of his patented art. When the patented product, as is often the case, represents merely one of many products that effectively compete in a given product market, few antitrust problems arise. When, however, the patented product is so successful that it evolves into its own economic market, as was the case here, or succeeds in engulfing a large section of a preexisting product market, the patent and antitrust laws necessarily clash. In such cases the primary purpose of the antitrust laws—to preserve competition— can be frustrated, albeit temporarily, by a holder's exercise of the patent's inherent exclusionary power during its term.

## II.

The law is unsettled concerning the effect under the antitrust laws, if any, that the evolution of a patent monopoly into an economic monopoly might have upon a patent holder's right to exercise the exclusionary power ordinarily inherent in a patent. Indeed, implicit in Judge Newman's decision below is a deep concern over the uncertain antitrust law implications just such an event might have had in this case. His thoughtful analysis of the relationship between the patent and antitrust laws led him to conclude that "the need to accommodate the patent laws with the antitrust laws precludes the imposition of damage liability . . . for a unilateral refusal to license valid patents." 463 F.Supp. at 1012–13. Judge Newman opined that whether or not Xerox's refusal to license the patents it acquired under the 1956 agreement transgressed any provisions of the antitrust laws, monetary damage liability could not be imposed upon Xerox without seriously undermining the patent system. The district court's thesis rests on the assumption that despite the lawfulness of a patent's acquisition, "[i]n some circumstances, [a] refusal to license may be considered a § 2 violation." 463 F.Supp. at 1012.

SCM has contended that a unilateral refusal to license a patent should be treated like any other refusal to deal by a monopolist, see generally *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), where the patent has afforded its holder monopoly power over an economic market. While, as SCM suggests, a concerted refusal to license patents is no less unlawful than other concerted refusals to deal, in such cases the patent holder abuses his patent by attempting to enlarge his monopoly beyond the scope of the patent granted him. *See, e. g., Zenith Radio Corp. v. Hazeltine Research, Inc., supra*, 395 U.S. at 118–19, 89 S.Ct. at 1573–1574; *United States v. Singer*

*Manufacturing Co.*, 374 U.S. 174, 192–97, 83 S.Ct. 1773, 1782–85, 10 L.Ed.2d 823 (1963); *United States v. Line Material Co.*, 333 U.S. 287, 314–15, 68 S.Ct. 550, 564, 92 L.Ed. 701 (1948); *Hartford-Empire Co. v. United States*, 323 U.S. 386, 406–07, 65 S.Ct. 373, 383–84, 89 L.Ed. 322 (1945); *United States v. Masonite Corp.*, 316 U.S. 265, 277, 62 S.Ct. 1070, 1077, 86 L.Ed. 1461 (1942). Where a patent holder, however, merely exercises his "right to exclude others from making, using, or selling the invention," 35 U.S.C. § 154 (1976), by refusing unilaterally to license his patent for its seventeen-year term, *see, e. g., Bement v. National Harrow Co.*, 186 U.S. 70, 88–90, 22 S.Ct. 747, 754–755, 46 L.Ed. 1058 (1902), such conduct is expressly permitted by the patent laws. "The heart of [the patentee's] legal monopoly is the right to invoke the State's power to prevent others from utilizing his discovery without his consent." *Zenith Radio Corp. v. Hazeltine Research, Inc., supra*, 395 U.S. at 135, 89 S.Ct. at 1582 (citing *Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 43 S.Ct. 254, 67 L.Ed. 516 (1923); *Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122 (1908)). Simply stated, a patent holder is permitted to *maintain* his patent monopoly through conduct permissible under the patent laws.

No court has ever held that the antitrust laws require a patent holder to forfeit the exclusionary power inherent in his patent the instant his patent monopoly affords him monopoly power over a relevant product market. In *Alcoa* this Court never questioned the legality of the economic monopoly Alcoa maintained by virtue of the two successive patents it had acquired. *United States v. Aluminum Co. of America, supra*, 148 F.2d at 422, 430. Indeed, Judge Learned Hand termed Alcoa's economic monopoly during the terms of those patents "lawful." 148 F.2d at 430. We do not interpret Judge Wyzanski's decision in *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295 (D.Mass.1953), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954), as supporting SCM's argument to the contrary. In *United Shoe*, the

primary vehicle found to have been employed by United Shoe in achieving and maintaining its monopoly was its lease-only system of distributing its machines. 110 F.Supp. at 344. The patent acquisitions scrutinized by Judge Wyzanski occurred after United Shoe possessed substantial market power and were not "one of the principal factors ... enabling [United Shoe] to achieve and hold its share of the market." 110 F.Supp. at 312. Thus, contrary to appellant's contention, the *United Shoe* case stands in stark contrast to the one at bar where the patents were acquired prior to the appearance of the relevant product market and where the patents themselves afforded Xerox the power to achieve eventual market dominance.

In *Alcoa* Judge Learned Hand stated that the "successful competitor, having been urged to compete, must not be turned upon when he wins." 148 F.2d at 430. And while that statement was made in regard to a hypothetical situation where only one of a group of competitors ultimately survives, it at least indicates a concern Judge Hand had for preserving those economic incentives that provide the primary impetus for competition. Subsequently, the Supreme Court in *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), amplified this consideration when it set forth the elements of a § 2 violation as follows:

> The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power *as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.*

*Id.* at 570–71, 86 S.Ct. at 1703–04 (emphasis added).

■ Thus, in *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), this Court stated that "[w]e tolerate the existence of monopoly power ... only insofar as necessary to preserve competitive incentives and to be

fair to the firm that has attained its position innocently." In *United States v. Griffith*, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), the Supreme Court declared, however, that "the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful." *Id.* at 107, 68 S.Ct. at 945. Echoing the same consideration in *Berkey*, Judge Kaufman stated that while "[t]he mere possession of monopoly power does not *ipso facto* condemn a market participant ..., the firm must refrain at all times from conduct directed at smothering competition." *Berkey Photo, Inc. v. Eastman Kodak Co., supra*, 603 F.2d at 275.

The tension between the objectives of preserving economic incentives to enhance competition while at the same time trying to contain the power a successful competitor acquires is heightened tremendously when the patent laws come into play. As the facts of this case demonstrate, the acquisition of a patent can create the potential for tremendous market power.

### III.

■ Patent *acquisitions* are not immune from the antitrust laws. Surely, a § 2 violation will have occurred where, for example, the dominant competitor in a market acquires a patent covering a substantial share of the same market that he knows when added to his existing share will afford him monopoly power. *See generally Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416 (10th Cir.), *cert. denied*, 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952); *United States v. Besser Manufacturing Co.*, 96 F.Supp. 304, 310–11 (E.D.Mich.1951), *aff'd*, 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063 (1952). That the asset acquired is a patent is irrelevant; in such a case the patented invention already has been commercialized successfully, and the magnitude of the transgression of the antitrust laws' proscription against willful aggregations of market power outweighs substantially the negative effect that the elimination of that class of purchasers for commercialized patents places upon the patent system.

The patent system would be seriously undermined, however, were the threat of potential antitrust liability to attach upon the acquisition of a patent at a time prior to the existence of the relevant market and, even more disconcerting, at a time prior to the commercialization of the patented art. As SCM itself admits, the procurement of a patent by the inventor will not violate § 2 even where it is likely that the patent monopoly will evolve into an economic monopoly; yet SCM would deny the same reward to anyone but the patentee.[9]

If the antitrust laws were interpreted to proscribe the natural evolution of a patent monopoly into an economic monopoly, then Judge Newman's concern would be well founded. If the threat of treble damage liability for refusing to license were imbedded in the minds of potential patent holders as a likely prospect incident to every successful commercial exploitation of a patented invention, the efficacy of the economic incentives afforded by our patent system might be severely diminished.

■ Nevertheless, it is especially clear that the economic incentives provided by the patent laws were intended to benefit only those persons who lawfully acquire the rights granted under our patent system. Cf. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172,

86 S.Ct. 347, 15 L.Ed.2d 247 (1965) (patent obtained by fraud on Patent Office). Where a patent in the first instance has been lawfully acquired, a patent holder ordinarily should be allowed to exercise his patent's exclusionary power even after achieving commercial success; to allow the imposition of treble damages based on what a reviewing court might later consider, with the benefit of hindsight, to be too much success would seriously threaten the integrity of the patent system. Where, however, the acquisition itself is unlawful, the subsequent exercise of the ordinarily lawful exclusionary power inherent in the patent would be a continuing wrong, a continuing unlawful exclusion of potential competitors.

■ Without passing upon the validity of Judge Newman's theory to preclude antitrust damage liability in all cases where the injury is predicated upon a patent holder's refusal to license, we hold that where a patent has been lawfully acquired, subsequent conduct permissible under the patent laws cannot trigger any liability under the antitrust laws.[10] This holding, we believe, strikes an adequate balance between the patent and antitrust laws. Therefore, to determine whether Xerox incurred any antitrust damage liability to SCM in 1969, our inquiry must now shift to determining

---

**9.** Notwithstanding that "[t]he law . . . recognizes that [a patentee] may assign to another his patent, in whole or in part, and may license others to practice his invention," *Zenith Radio Corp. v. Hazeltine Research, Inc., supra*, 395 U.S. at 135, 89 S.Ct. at 1582, SCM argues that a distinction should be made between the exploitation of a patent by an inventor and an investor. We assume, therefore, that had Chester Carlson possessed the resources to commercialize xerography to the same extent as did Xerox, SCM would not have challenged a refusal by the inventor to license his patents as violative of the antitrust laws. Investors, however, play a key role, if not an indispensable one today, in both the inventive process and commercialization of inventions. And it is fair to say, we think, that the contribution of the investor in both the funding of research that leads to inventions and the promotion that necessarily must follow to achieve successful commercialization is of comparable value. *See generally Picard v. United Aircraft Corp.*, 128 F.2d 632, 642 (2d Cir.), *cert. denied*, 317 U.S.

651, 63 S.Ct. 46, 87 L.Ed. 524 (1942) (Frank, J., concurring). In either case, the ultimate intended beneficiary of the patent laws—the public—is equally benefited. *See generally Mannington Mills, Inc. v. Congoleum Industries, Inc.*, 610 F.2d 1059, 1070–71 (3d Cir. 1979); *United States v. Parker-Rust-Proof Co.*, 61 F.Supp. 805, 808 (E.D.Mich.1945); *In re Anthony*, 414 F.2d 1383, 1398 (Cust. & Pat.App.1969); *In re Herr*, 377 F.2d 610, 619, 54 CCPA 1315 (1967). Since Xerox participated financially in both the inventive process by funding research at Battelle and the subsequent commercialization of xerography by bringing the first plain-paper copier to the market, we see little reason to deny Xerox the full benefit of the patents it acquired on this basis alone.

**10.** We leave for an appropriate case the resolution of the question whether damage liability can accrue to a holder for refusing to license patents that he subsequently abuses through pooling or otherwise.

whether the acquisition of the Carlson and Battelle patents pursuant to the 1956 agreement violated either the Sherman Act or the Clayton Act. Because the essence of a patent is the monopoly or exclusionary power it confers upon the holder, analyzing the lawfulness of the acquisition of a patent necessitates that we primarily focus upon the circumstances of the acquiring party and the status of the relevant product and geographic markets at the time of acquisition.

## IV.

*Section 2 of the Sherman Act*

■ Turning to the facts of this case, the patents about which we are concerned were acquired in 1956, four years prior to the production of the 914, Xerox's first automatic plain-paper copier, and at least eight years prior to the appearance of the relevant market and submarket. In 1956 Xerox had achieved success in the commercialization of xerography but not in the field of automatic plain-paper copying. There is evidence in the record, however, that Xerox in 1956 valued a non-exclusive license in xerography at $70 million and that key personnel at Xerox believed that they already possessed the necessary technology in 1956 to produce a plain-paper copier. Notwithstanding their optimistic forecasts, however, the confidence of the Xerox organization was still tempered by the risks of producing a new, technologically-sophisticated product line. Thus, in 1958 Xerox considered the possibility of having IBM manufacture and market the 914. But before Xerox's management made a final decision on the matter, IBM informed them that it was not interested in manufacturing or marketing the 914 or another model, the 813, having concluded that both were a bad business risk. While SCM argues that IBM's turndown was directed exclusively at the models 914 and 813 and did not amount to a rejection of plain-paper copying entirely, at the very least the episode demonstrates that as of 1958 the achievement of

commercial success in plain-paper copying was not a foregone conclusion.

It was also in 1956 that Xerox acquired non-exclusive licenses from Horizons Corporation, another research organization, covering a small number of xerographic patents.[11] Additionally, Xerox began to cultivate relationships with its international family of companies in 1956. But SCM has not argued that either the Horizons patents or the international agreements caused it any injury. Rather, SCM contends that these facts constitute proof of Xerox's willful acquisition of monopoly power over the relevant market and submarket that came into being, according to the jury, between eight and thirteen years later. Likewise, other aspects of the 1956 agreement with Battelle, such as the promise by Battelle to transfer to Xerox all know-how it developed and patents it obtained in the future were claimed to be additional evidence of Xerox's willful acquisition of its market dominance. But the promise to transfer all xerographic know-how developed and patents obtained in the future was conditioned on Xerox's promise to contribute at least $25,000 a year for research that would help develop the know-how and patents. There appears to be little distinction, if any, between patents obtained under a contract with a research organization and patents generated internally by a company, *see* P. Areeda & D. Turner, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 704e (1978), and ordinarily there is no limitation on a company's freedom to generate its own patents. *See generally Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.*, 339 U.S. 827, 834, 70 S.Ct. 894, 898, 94 L.Ed. 1312 (1950). The jury's specific finding that by 1969 Xerox had not obtained any patents primarily for the purpose of blocking the development and marketing of competitive products laid to rest any suspicion that either Xerox's internal R & D program or its R & D work subcontracted to Battelle was driv-

---

11. In 1960 Horizons Corporation agreed to assign these patents to Xerox.

en principally by anticompetitive animus.[12] In any event, none of Xerox's conduct other than the acquisition of the Carlson and Battelle patents under the 1956 agreement caused SCM any harm. But even more important, all of the events described occurred between eight and thirteen years prior to the appearance of the relevant product market and submarket defined by SCM.

In scrutinizing acquisitions of patents under § 2 of the Sherman Act, the focus should be upon the market power that will be conferred by the patent *in relation* to the market position then occupied by the acquiring party. We agree with Professors Areeda and Turner that whether limitations should be imposed on the patent rights of an acquiring party should be dictated by the extent of the power already possessed by that party in the relevant market into which the products embodying the patented art enter. *See* Areeda & Turner, *supra*, at ¶ 819. Therefore, that Xerox acquired the patents in this case four years prior to the production of the first plain-paper copier and at least eight years prior to the appearance of the relevant product market and submarket over which those patents eventually afforded it monopoly power would seem to dispose entirely of SCM's 1969 exclusion claim under § 2.

SCM argues, however, that

[t]o uphold the jury's verdicts in this case, this Court need hold only that an agreement to purchase patents that eliminate an existing potential for competition in a reasonably foreseeable economic market can be found to be unreasonable if it (a) results in the acquisition of persistent, substantial, real-world economic monopoly power and (b) imposes a restraint on competition that is greater than reasonably necessary to induce the purchaser to develop and market the product involved.

SCM Reply Br. at 27. SCM's proposition is that even prior to the commercialization of the patented invention and prior to the appearance of the relevant market over which Xerox eventually achieved monopoly power a § 2 violation occurred. SCM suggests that the antitrust laws impose a limitation on the extent of the rights in a patent a purchaser may acquire, and that in some instances a patent with its inherent exclusionary power may not be transferred *in toto.* The limitation that SCM would impose, however, turns not upon the market position of the acquiring party, but rather, upon the potential for commercial success a particular patent may hold. Thus, SCM argues that a purchaser of a patent is entitled only to the rights in a patent reasonably necessary to induce his investment to commercialize the patent. Presumably, under SCM's proposed rule, where the commercial success of a patented invention virtually is guaranteed, no person other than the inventor can hold exclusive rights in the patent, at least where it is foreseeable that the products generated under the patent will create their own relevant product market.

SCM contends that the test it proposes represents the appropriate rule of reason analysis to be employed in patent acquisition cases. By introducing the concept of foreseeability, SCM seeks to escape an unfavorable disposition of its case that it apparently feared might be based upon the absence of the relevant product market and submarket at the time of the patent acquisitions in 1956. Implicit in the jury's findings was that it was reasonably foreseeable in 1956 that the agreement with Battelle would permit Xerox to obtain monopoly power in a relevant product market.[13]

---

**12.** SCM also argues that the two-year covenants not to compete imposed by Xerox on its employees up until 1972 also evidence Xerox's willful acquisition of monopoly power. We find this argument wholly without merit.

**13.** This finding was implicit in the jury's affirmative answer to question 20: "Was the probable effect of Xerox's acquisition of patents pursuant to the 1956 Xerox-Battelle agreement,

when the agreement was made, substantially to lessen competition or to tend to create a monopoly in any relevant market or sub-market that you have found to exist?" In explaining this question, Judge Newman instructed the jurors to determine "whether the acquisition at the time it was made was reasonably probable to have the proscribed effect in the reasonably foreseeable future."

While sufficient evidence was presented by Xerox to support a contrary finding, we are unable to hold, as a matter of law, that no rational jury could find that a reasonably foreseeable effect of the 1956 agreement was the eventual acquisition by Xerox of monopoly power in a relevant market. But notwithstanding the jury's implicit finding, we conclude that, under the facts presented here, the policies of the patent laws preclude the imposition of antitrust liability.

It is undisputed that the first automatic plain-paper copier was not produced by Xerox until four years after the 1956 agreement was executed. Additionally, while Xerox concedes that its plain-paper copiers eventually formed an independent relevant product market, SCM has not challenged on appeal the jury's finding that this event did not occur until some time after 1964, eight years after the agreement. Furthermore, Xerox contributed in a very substantial way to the development of an automatic plain-paper copier by investing in research and development not only after 1956 but also for almost a decade before the agreement. Moreover, the party from whom Xerox purchased the patent under the 1956 agreement was not a potential competitor. We believe that, under the circumstances presented here, to impose antitrust liability upon Xerox would severely trample upon the incentives provided by our patent laws and thus undermine the entire patent system. Therefore, irrespective of the jury's implicit finding that Xerox's commercial success was reasonably foreseeable in 1956, Xerox was lawfully entitled to purchase the patents it did pursuant to the agreement it made with Battelle that year.

With respect to Xerox's subsequent unilateral refusal to license the Carlson and Battelle patents, which we have held were lawfully acquired, that conduct was permissible under the patent laws and, therefore, did not give rise to any liability under § 2.

*Section 1 of the Sherman Act*

SCM contends that the jury implicitly concluded that the patent acquisitions pursuant to the 1956 agreement unreasonably restrained trade in 1956, since they had been instructed that "if it was lawful for Xerox to acquire the four basic Carlson patents in 1956 and the then existing Battelle patents in 1959, then those aspects of the 1956 agreement [could not] contribute to a section 1 violation at some later time." (J.App.4533). While this may be a fair inference to draw in light of the charge, we are convinced that, as a matter of law, the 1956 agreement did not unreasonably restrain trade in violation of § 1 at the time it was executed. As Judge Newman noted below, the transfer of the Carlson and Battelle patents pursuant to the 1956 agreement could not have restrained any "competition in 1956 or 1959 because there was no competition in any convenience-office copier or plain-paper copier embodying the patented inventions" in either of those years. 463 F.Supp. at 1004.

The gist of SCM's § 1 argument is that absent the 1956 agreement, Battelle would have enforced the sublicensing obligation that its prior agreements had imposed upon Xerox, and through the sublicenses generated by that contractual obligation there would have been competitors in plain-paper copying, with SCM among them. Along the lines of its § 2 argument, SCM argues that the 1956 agreement was an unreasonable restraint of trade because it gave to Xerox absolute exclusionary power, rather than that amount of power reasonably necessary to induce Xerox to continue its efforts to commercialize xerography. SCM contends that because Xerox foresaw commercial success and dominance over the convenience office copier market, the 1956 agreement which gave Xerox the power to eliminate substantial potential competition was unreasonable and, therefore, illegal. Since we have already concluded in our § 2 discussion that under the facts presented here, the policies of the patent laws forbid the imposition of antitrust liability irrespective of the jury's implied finding that Xerox's success in plain-paper copying was foreseeable in 1956, SCM's argument under § 1 along these lines must likewise fail.

While, in an economic sense, it might have been unreasonable in 1964 and 1969 for Xerox unilaterally to refuse to license for plain-paper copying use any of the xerographic patents acquired pursuant to the 1956 agreement, the lawfulness of their acquisition in 1956 rendered that conduct, which was permitted under the patent laws, reasonable for § 1 purposes.[14]

The only continuing contractual obligation under the 1956 agreement which could be reasonably challenged under § 1 as of 1964 or 1969 is the provision that obligated Battelle to continue to assign to Xerox all xerographic patents it obtained and know-how it developed. However, all of the contractual obligations between Xerox and Battelle under the 1956 agreement that are claimed by SCM to have caused it any injury were fully performed by January 2, 1959. SCM offered no evidence at trial that any of the patents Xerox obtained from Battelle after January 2, 1959 caused it any harm. Since the latter provision of the 1956 agreement does not provide a basis for SCM to recover damages, we need not decide its reasonableness under § 1 as of 1964 or 1969.

SCM argues alternatively that Xerox's continued holding of the Carlson and Battelle patents unreasonably restrained trade in 1969 in violation of § 1. As Judge Newman noted below, "there is no authority for upholding damage liability under § 1 because of the subsequent holding of a patent previously acquired." 463 F.Supp. at 1004. And we see no reason to expand judicially the scope of § 1 of the Sherman Act to accommodate a claim that is already cognizable under another antitrust provision —§ 7 of the Clayton Act, see United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957) ("du Pont-GM"), especially where the claim has been so asserted.

*Section 7 of the Clayton Act*

Section 7 of the Clayton Act proscribes a corporation from acquiring the whole or any part of the assets of another corporation where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly [in any line of commerce]," 15 U.S.C. § 18 (1976). Since a patent is a form of property, see generally Transparent-Wrap Machine Corp. v. Stokes & Smith Co., 329 U.S. 637, 643, 67 S.Ct. 610, 614, 91 L.Ed. 563 (1947), and thus an asset, there seems little reason to exempt patent acquisitions from scrutiny under this provision. See United States v. Lever Brothers Co., 216 F.Supp. 887, 889 (S.D.N.Y.1963); see generally L. Sullivan, Handbook of the Law of Antitrust, § 180 (1977); 16a J. von Kalinowski, Business Organizations: Antitrust Laws and Trade Regulation § 16.05 (1980); Kessler & Stern, *Competition, Contract, and Vertical Integration*, 69 Yale L.J. 1, 75–78 (1959).

Section 7 principally was designed to curtail the anticompetitive consequences of corporate acquisitions in their "incipiency." *Brown Shoe Co. v. United States*, 370 U.S. 294, 317, 82 S.Ct. 1502, 1519, 8 L.Ed.2d 510 (1962). Thus, the analysis ordinarily employed in determining the lawfulness of a corporate acquisition under § 7 is prospective in nature. The jury found that the probable effect of the 1956 Xerox-Battelle agreement was substantially to lessen competition or to tend to create a monopoly in the relevant product market and submarket that appeared between eight and thirteen years later. The jury additionally found that, as of 1964 and 1969, the probable effect of Xerox's continued holding of patents acquired pursuant to the 1956 Xerox-Battelle agreement was substantially to lessen competition or to tend to create a monopoly. We conclude that neither of these findings can stand as a matter of law.

14. In connection with the patents assigned on January 2, 1959, the transfer of these improvement patents on that date pursuant to the 1956 agreement was a mere formality. Under the 1956 agreement, Xerox acquired an exclusive license to each of Battelle's then existing and future xerographic patents on the date the agreement was executed. Thus Xerox had already acquired the exclusionary power inherent in each of those patents prior to their formal assignment on January 2, 1959.

While the Supreme Court in *Brown Shoe Co. v. United States, supra,* 370 U.S. at 323, 82 S.Ct. at 1522, stated that the language contained in § 7 is indicative that Congress' "concern was with probabilities, not certainties," the speculative aspect of this antitrust law was intended to allow courts to appreciate immediately the potential consequences that a particular acquisition might have upon an *existing* line of commerce. Thus in *Brown Shoe,* the Supreme Court stated:

> Because § 7 of the Clayton Act prohibits any merger which may substantially lessen competition "in *any* line of commerce," (emphasis supplied) it is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition.

370 U.S. at 325, 82 S.Ct. at 1523. The existing market provides the framework in which the probability and extent of an adverse impact upon competition may be measured. In the case at bar it would have been impossible to examine the effects of the Xerox-Battelle agreement upon the relevant product market and submarket in 1956 because those markets did not come into being until sometime between 1964 and 1969. The jury was instructed that it should include in its considerations whether the appearance of the relevant market and submarket and Xerox's domination of those markets was reasonably foreseeable in 1956. (J.App. 4551–54).

Judge Newman concisely stated below that "[s]ection 7 is concerned with undue concentrations of power and the anti-competitive effects of permitting one entity with market power to strengthen its position by acquisition." 463 F.Supp. at 1001–02. Where, as here, it is conceded that the relevant product market and submarket did not exist until eight years following the patent acquisitions and that Xerox possessed no power whatsoever in even the inchoate market and submarket until 1960 when it introduced its 914 copier, as a matter of law the 1956 agreement did not violate § 7 at the time it was made. Finally, our decision regarding SCM's foreseeability

argument under §§ 1 and 2 of the Sherman Act disposes of its argument propounded under § 7 along those lines.

SCM argues alternatively that the Supreme Court's decisions in *du Pont-GM, supra,* and *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975), require that we affirm the jury's second finding under § 7 that Xerox's continued "holding" of the patents it obtained under the Xerox-Battelle agreement in 1956 violated § 7 as of 1969. In *du Pont-GM,* the government commenced its action approximately thirty years after du Pont had purchased a twenty-three percent stock interest in General Motors Corporation, and alleged that du Pont had used its stock ownership to attain a "commanding position as General Motors' supplier of automotive finishes and fabrics," 353 U.S. at 588–89, 77 S.Ct. at 874–75. There the Court held that

> any acquisition by one corporation of all or any part of the stock of another corporation, competitor or not, is within the reach of the section *whenever the reasonable likelihood* appears that the acquisition will result in a restraint of commerce or in the creation of a monopoly in any line of commerce.

353 U.S. at 592, 77 S.Ct. at 876 (emphasis added). Subsequently, in *ITT Continental Baking,* the Court reaffirmed, albeit in dictum, its holding in *du Pont-GM* that the term acquisition as it is employed in § 7 comprehends both the initial "acquiring" and subsequent "retaining" of the stock of another corporation. 420 U.S. at 241–42, 95 S.Ct. at 936–37. Relying on these cases, SCM would have us hold that Xerox's acquisition of the Carlson and Battelle patents in 1956 became actionable under § 7 as soon as the monopoly afforded by the patents burgeoned into an economic monopoly. Whatever the meaning that may be ascribed to § 7 in other contexts, the patent laws circumscribe the scope of the provision here. Where a corporation's acquisition of a patent is not violative of § 7, as was the case here, its subsequent holding of the patent cannot later be deemed violative of

this section. Where a company has acquired patents lawfully, it must be entitled to hold them free from the threat of antitrust liability for the seventeen years that the patent laws provide. To hold otherwise would unduly trespass upon the policies that underlie the patent law system. The restraint placed upon competition is temporarily limited by the term of the patents, and must, in deference to the patent system, be tolerated throughout the duration of the patent grants.

*The MUP Claim*

The jury determined that the Machine Utilization Plan implemented by Xerox in 1968 coerced some of Xerox's high-volume machine customers to take Xerox's low-volume machines and that the effect of MUP was to tend to create a monopoly or to lessen substantially competition in a relevant market or submarket. These findings supported SCM's contention that MUP constituted an illegal tying arrangement in violation of § 3 of the Clayton Act, 15 U.S.C. § 14 (1976). The jury additionally concluded that MUP was utilized by Xerox to foreclose competition or to gain a substantial competitive advantage. This finding translated into a § 2 violation, since the jury also determined that Xerox possessed monopoly power in 1969. *See generally United States v. Griffith, supra*, 334 U.S. at 107, 68 S.Ct. at 945. Judge Newman ruled, however, that notwithstanding the jury's findings concerning the substantive aspects of SCM's MUP claim, SCM had failed to demonstrate a rational, causal connection between the profits lost by SCM and MUP.

In *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946), the Supreme Court set forth the standard to be satisfied to sustain an award of treble damages in a private antitrust suit:

[I]n the absence of more precise proof, the jury [can] conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs.

We agree that a liberal rule of damages must be applied in antitrust cases both to encourage private enforcement of the antitrust laws and to insure that the defendant bears "the risk of the uncertainty which his own wrong has created." *Id.* at 265, 66 S.Ct. at 580, *see Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 763 (2d Cir. 1979). But the *Bigelow* Court carefully pointed out that "even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork." *Bigelow v. RKO Radio Pictures, Inc., supra*, 327 U.S. at 264, 66 S.Ct. at 579. We are of the opinion that even under the liberal *Bigelow* rule, SCM failed to carry its burden.

SCM calculated its damages caused by MUP based on the cancellation rates of Xerox's low-volume copiers before and after the MUP marketing program was implemented. SCM's theory is that if MUP had the effect of decreasing the cancellation rates of its low-volume copiers, then it can be inferred that MUP coerced some customers into retaining unwanted Xerox low-volume copiers instead of using low-volume coated-paper copiers manufactured by Xerox's competitors. SCM offered evidence of the percentage of Xerox low-volume machine customers who cancelled and were acquired by SCM prior to MUP and the drop in the overall Xerox low-volume machine cancellation rate and the concomitant loss of dissatisfied Xerox customers after MUP. SCM contended that it would have received the same share of the additional cancellations that it received of actual cancellations after MUP. Xerox, however, revealed a gaping hole in SCM's damage theory: the cancellation rates of three out of four of Xerox's low-volume machines actually increased following MUP. Additionally, with respect to the only Xerox low-volume machine whose cancellation rate actually fell following MUP, the 813, Xerox pointed out that SCM calculated its lost

placements on the basis of the entire 813 population rather than on the substantially smaller population of 813s on MUP. While the latter deficiency would merely require that the damages be recalculated on remand, the insufficient showing of causality between MUP and the decline in 813 cancellations leads us to affirm Judge Newman's conclusion below. While an antitrust plaintiff may, in a proper case, recover damages based upon evidence of lost profits "not shown to be attributable to other causes," *Bigelow v. RKO Radio Pictures, Inc., supra,* 327 U.S. at 264, 66 S.Ct. at 579, the plaintiff must support by more than mere speculation its allegation of causality between the defendant's acts and the injury it incurred. SCM's own expert witness conceded at trial that he could not explain the fact that the cancellation rates of three out of four of Xerox's low-volume machines increased following MUP. In light of these facts we agree with Judge Newman's decision that it would be irrational to attribute the decline in the cancellation rate of the 813 to MUP.

*Conclusion*

The controlling question of law certified by Judge Newman below and accepted by this Court for interlocutory review concerning SCM's 1969 exclusion claim is answered in the negative. Based on the evidence presented we are convinced that none of Xerox's patent-related conduct contributed to any antitrust violation and that, therefore, SCM is not entitled to recover any monetary damages in connection with that claim.

With respect to SCM's MUP claim, we affirm Judge Newman's decision denying damage recovery on the ground that insufficient evidence was offered by SCM to support the jury's finding that the lost profits claimed by SCM were caused by MUP.

This action is remanded to the district court for further proceedings consistent with this opinion.

WATERMAN, *Circuit Judge:*

I concur in the result.