**LOUISIANA WHOLESALE DRUG COMPANY, INC., on behalf of itself and all others similarly situated, Plaintiff,**

v.

**SHIRE LLC and Shire U.S., Inc., Defendants.**

**No. 12 Civ. 3711 (VM).**

United States District Court, S.D. New York.

March 6, 2013.

Bruce E. Gerstein, Kimberly Marion Hennings, Garwin Gerstein & Fisher, L.L.P., Brian Dale Brooks, Smith Segura & Raphael, LLP, New York, NY, David C. Raphael, Jr., David P. Smith, Smith Segura & Raphael, LLP, David P. Smith, Percy, Smith & Foote, LLP, Alexandria, LA, John E. Fitzpatrick, III, John Gregory Odom, Stuart Edward Des Roches, Odom & Des Roches, LLP, New Orleans, LA, for Plaintiff.

John F. Collins, Frommer Lawrence & Haug LLP, New York, NY, Michael F. Brockmeyer, Frommer, Lawrence & Haug, L.L.P., Washington, DC, for Defendants.

## DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiff Louisiana Wholesale Drug Company, Inc. ("LWD"), on behalf of itself and all others similarly situated, brought this action against Shire LLC and Shire U.S., Inc. (collectively, "Shire" or "Defendants"), asserting a violation of 15 U.S.C. § 2. Shire filed a motion to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Upon the Court's consideration of Shire's motion, LWD's opposition, and Shire's reply, for the reasons discussed below, Shire's motion is GRANTED.

## I. BACKGROUND [1]

Shire holds patents for and manufactures Adderall XR, a popular drug in the treatment of attention-deficit-hyperactivity-disorder since its introduction to the market in 2001. LWD is a drug wholesaler that purchased Adderall XR and its generic equivalents from Shire and other parties. This dispute sits at the intersection of patent law, pharmaceutical regula-

---

1. The factual summary below is derived from LWD's Class Action Complaint. The Court will make no further citations to this source unless otherwise specified.

tion, and antitrust law, with principles of contract law thrown in for good measure.

The Federal Food, Drug, and Cosmetics Act (the "FDCA") regulates the introduction of drugs into the marketplace. *See* 21 U.S.C. §§ 301 et seq. Manufacturers of new drugs must file a New Drug Application ("NDA"), which must be approved by the Food and Drug Administration ("FDA") in order for the drug to be sold. The FDA approved Shire's NDA for Adderall XR on October 11, 2001, and, over the next decade, Shire enjoyed net sales of more than $6.5 billion.

But Shire's patents and approved NDA covering Adderall XR did not ensure complete exclusivity over that time. Indeed, federal law attempts to strike a balance between rewarding the innovation of drug manufacturers through the patent system and fostering competition in the marketplace through FDA approvals of generic drugs. Specifically, a 1984 amendment to the FDCA called the Drug Price Competition and Patent Term Restoration Act (the "Hatch–Waxman Act") implemented a streamlined method for generic drug manufacturers to enter the marketplace: the filing of an Amended New Drug Application ("ANDA"). While an NDA requires scientific findings of safety and efficacy, a generic manufacturer of an already-approved drug can rely on those findings in the original NDA, and need only demonstrate that its new drug is "bioequivalent" to the original. At the same time, the Hatch–Waxman Act provided a measure of protection against the introduction of generic drugs by granting original manufacturers a thirty-month stay of FDA approval of the ANDAs of their generic competitors.

Shire's competition wasted little time in attempting to join the marketplace for Adderall. Two competitors are particularly

relevant to this case: Teva and Impax. In November 2002, Teva filed an ANDA seeking FDA approval to manufacture and sell generic Adderall XR in the United States. Impax filed a similar ANDA in November 2003. Both manufacturers asserted that Shire's patents covering Adderall XR did not block the introduction of their generic products. Perhaps predictably, these streamlined applications triggered exactly the response envisioned by the Hatch–Waxman Act: Shire sued both Teva and Impax for patent infringement and received the accompanying automatic thirty-month stay of FDA approval for both ANDAs.

Ultimately, Shire settled its patent infringement lawsuits with Teva and Impax in 2006. Each settlement had the same structure: the generic manufacturers agreed not to launch any of their own products into the Adderall XR market for roughly three years,[2] thereby preserving Shire's market share. In return, Shire agreed to grant Teva and Impax patent licenses to sell generic Adderall XR once the three year no-competition window closed, and further agreed to supply all of Teva and Impax's needs for generic Adderall XR under separate requirements contracts with each. All parties to these settlements hedged their risks and received real benefits. Shire gained three years of guaranteed non-competition from two would-be generic distributors, while Teva and Impax received reduced barriers to market entry (in the form of patent licenses and a guaranteed supply of Adderall XR they could sell as generics) in exchange for their delayed entry.

These settlement agreements—specifically, Shire's alleged performance failures—sow the seeds of LWD's antitrust claim. According to LWD, while Shire continued to enjoy monopoly power

---

**2.** Teva's bar date was April 1, 2009, while Impax's was October 1, 2009.

through 2009 under the agreements, and it granted patent licenses to both Teva and Impax, it failed to meet the terms of its requirements contracts with the two generic distributors. LWD alleges that Shire, instead of supplying each entity with *all* the Adderall XR they demanded, intentionally breached the contracts to keep supplies artificially low and prices artificially high.[3]

In both cases, Shire failed to supply the requested amount of Adderall XR mere months after the requirements contracts kicked in. Although Shire continued to supply some product to both Teva and Impax and never failed to perform completely, LWD alleges that Shire instead kept 40–50% of the Adderall XR product to itself, thereby continuing to dominate sales in the market.[4] If it had fully complied with the requirements contracts, LWD contends, Shire's market share would have dropped to approximately 10%, as customers would have opted for the cheaper, generic (but chemically equivalent) products from Teva and Impax. In fact, Shire raised its prices on branded Adderall XR in late 2010, and subsequently increased the percentage of Adderall XR it kept for itself.

LWD alleges that Shire engaged in these actions with the intent to subvert competition in the Adderall XR market by sacrificing bona fide profits under the requirements contracts in favor of charging monopoly prices on its own sales (and even raising those prices as a result of the bottleneck it created).[5] Further, LWD alleges that Shire largely achieved its desired result: instead of watching its market share drop to roughly 10% in 2009, Shire's decision to limit supply allowed it to maintain 40–50% of sales in the market and watch as its revenues climbed. As a result of these artificial shortages, Teva and Impax could not compete with each other as generic suppliers in the market, meaning that not only were customers forced to pay monopolistic prices for branded Adderall XR, but they were also forced to pay inflated prices for the generic products sold by Teva and Impax.

## II. *LEGAL STANDARD*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (*quoting Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the specula-

---

3. Neither Teva nor Impax have received FDA approval to manufacture their own generic Adderall XR, so Shire remains the sole supplier.

4. In the case of the Teva agreement, LWD highlights a statement from a Shire employee to a Teva employee admitting that the breach was a result of Shire's senior management's decision to keep more product for itself.

5. LWD asserts in the complaint that, in a breach of contract suit brought by Impax,

Shire asserted that the lack of supply was caused by the Drug Enforcement Administration's failure to set a high enough quota for Adderall XR pills, thus allowing Shire to reasonably allocate the supply. In rebuttal, LWD asserts that 1) the DEA itself has rejected this explanation for the product shortage, 2) even if the shortage was DEA-created, Shire could not allocate the pill supply, and 3) even if Shire *could* allocate the pill supply, it did not do so reasonably.

tive level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. The task of a court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *In re Initial Pub. Offering Sec. Litig.*, 383 F.Supp.2d 566, 574 (S.D.N.Y.2005) (internal quotation marks omitted). A court must accept as true all well-pleaded factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002). This standard holds true for antitrust cases such as this one. *See George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 555 (2d Cir.1977) ("It [is] clear in this circuit ... that a short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules.")[6]

## III. *DISCUSSION*

■LWD alleges a violation of 15 U.S.C. § 2. A claim under § 2 consists of two elements: "(1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 73

(2d Cir.1988). Defendants make three arguments in favor of dismissal: (1) LWD's claims cannot support an antitrust violation because Shire was acting within the bounds of its lawfully held patents for Adderall XR; (2) LWD has failed to allege facts supporting a "relevant market"; and (3) some of LWD's damage claims are barred because it is an "indirect purchaser" under *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

## A. *WHETHER LWD'S CLAIMS ARE BARRED BY SHIRE'S LAWFULLY HELD PATENTS*

■ Shire argues that LWD's allegations cannot constitute a valid claim because Shire was acting within the boundaries of its Adderall XR patents, which operate as a lawful monopoly. The argument, at its core, exists in the following parts: (1) Shire is the owner of Adderall XR patents, which grant it the right to exclude all others from the making and selling of Adderall XR; and (2) Shire's settlement agreements with Teva and Impax are within the scope of those patents and thus cannot be grounds for a monopolization claim. (*See* Dkt. No. 12 at 8–14.) The first prong of the argument is undisputed. LWD takes issue with the second prong, however, arguing that Shire effectively abandoned its right to a monopoly

---

**6.** Some Second Circuit precedent suggests a higher standard for antitrust cases. *See George Haug Co. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir.1998) ("In antitrust cases in particular, the Supreme Court has stated that 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.' " (*quoting Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976))). But these cases predate *Iqbal* and *Twombly*, and, moreover are inapposite here because they are largely animated by concerns regarding allegations of an antitrust

*conspiracy*, where "proof is largely in the hands of the alleged conspirators." *Hospital Bldg. Co.*, 425 U.S. at 746, 96 S.Ct. 1848 (internal quotation marks omitted). Plaintiff does not allege an antitrust conspiracy in this case. *See also Daniel v. American Bd. of Emergency Med.*, 988 F.Supp. 112, 122–23 (W.D.N.Y.1997) ("[B]ecause of the conspiratorial nature of certain antitrust claims, 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.' ") (emphasis added) (citation omitted).

by granting patent licenses to Teva and Impax, and violated antitrust laws by acting with anticompetitive malice in refusing to deal with Teva and Impax after the settlement agreements effectively established a duty to do so. (*See* Dkt. No. 19 at 8–13.)

Shire's argument relies heavily on the Second Circuit's decision in *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187 (2d Cir.2006), which grapples with the interplay between patent and antitrust law. In *Tamoxifen*, Zeneca, the holder of the patent on tamoxifen citrate (a drug used for the treatment of breast cancer), entered into a settlement agreement with Barr, an entity seeking to introduce a generic version. Among other terms of the agreement, Barr received a $21 million payment from Zeneca and a non-exclusive license to sell Zeneca-manufactured tamoxifen citrate; in return, Barr agreed not to market its own generic version of tamoxifen citrate until Zeneca's patent expired. Various consumer and consumer groups subsequently filed a number of lawsuits challenging the validity of the agreement between Zeneca and Barr, arguing, in part, that it violated antitrust laws.

■ The Second Circuit declined to find that the settlement agreement in *Tamoxifen* violated the Sherman Act, and in so doing enunciated two principles that help guide the Court's inquiry here. First, courts should generally seek to encourage parties to settle litigations, and although patent and antitrust law stand in tension with one another, the Sherman Act does not preclude the settlement of patent claims. *See id.* at 202 ("It is well settled that '[w]here there are legitimately conflicting [patent] claims ..., a settlement by agreement, rather than litigation, is not precluded by the [Sherman] Act,' although such a settlement may ultimately have an adverse effect on competition.") (alterations in original) (*quoting Standard Oil*

*Co. v. United States*, 283 U.S. 163, 171, 51 S.Ct. 421, 75 L.Ed. 926 (1931)). Second, direct "reverse" payments like the $21 million paid by Zeneca to protect its monopoly are not antitrust violations where the scope of the patent is not extended. *See id.* at 212–13 ("Whatever damage is done to competition by settlement is done pursuant to the monopoly extended to the patent holder by patent law unless the terms of the settlement enlarge the scope of that monopoly."). Although the Second Circuit has noted that *Tamoxifen* may be ripe for revisitation, it subsequently affirmed this approach in *Arkansas Carpenters Health & Welfare Fund v. Bayer AG*, 604 F.3d 98, 110 (2d Cir.2010) ("In sum, as long as *Tamoxifen* is controlling law, plaintiffs' claims [that reverse payments violate the Sherman Act] cannot survive.").

LWD counters with a different line of cases, arguing that, while the terms of the settlements as written may not constitute an antitrust violation, Shire's *actions* under those agreements nevertheless do because it had a duty to deal with its competitors and it violated that duty by failing to supply Adderall XR after contracting to do so. LWD principally relies on *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), in which the Supreme Court held that the right to refuse to cooperate with a rival was not unqualified, and that the owner of multiple ski resorts in Aspen, Colorado, violated § 2 by terminating a joint lift-ticket venture with a competitor and instead electing to market packaged deals for its own resorts only. The Court found that the evidence "supports an inference that [the monopolizing entity] was not motivated by efficiency concerns and that it was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival." *Id.* at 610–11, 105 S.Ct. 2847. Of importance, *Aspen Skiing*, unlike *Tamoxi-*

*fen* and the instant case, did not involve application of rights and remedies encompassed by patent law.

The dispute on this issue between the parties, then, boils down to this: Does Shire's decision to license its patent and then allegedly breach its agreements with Teva and Impax—conduct that LWD alleges was done with anticompetitive intent—sufficiently distinguish *Tamoxifen* and other Second Circuit case law generally upholding the validity of patent settlement agreements and instead place this case squarely in the duty to deal established by *Aspen Skiing* and its progeny?

It is true that *Tamoxifen* and its ilk are distinguishable because, while the Second Circuit upheld this type of *agreement*, it has not considered the anticompetitive effect of this type of *behavior*. And, if true, LWD's allegations suggest that, by gaining the benefit of three years of exclusivity in the Adderall XR market and then failing to uphold its end of the supply-chain bargain, Shire has engaged in the distasteful act of having its cake and eating it too (or, more accurately, hoarding its cake to drive up the cost of the goods and Shire's profits). Nevertheless, not every sharp-elbowed business practice—though potentially wrongful as a breach of contract or even fraud—necessarily amounts to an antitrust violation, as indeed, Shire's actions in this case do not.

While the terms of the settlement agreement in *Tamoxifen* do not perfectly overlap with those at issue in this case, the import of the Second Circuit's reasoning applies with equal force here: although such agreements are necessarily anticompetitive (in both *Tamoxifen* and this case, the patent holder sought to extend the time it had to sell its product without competition), settling parties in this arena should be granted wide latitude as long as the scope of the patent(s) at issue is undisturbed. *See Tamoxifen*, 466 F.3d at 218.

("The Agreement is no doubt 'anticompetitive'—the plaintiffs need no additional proof of that. It limited competition between generic tamoxifen and Zeneca's branded product. But, as we have seen, because it did not exceed the scope of the tamoxifen patent, it was not an unlawful anticompetitive agreement.").

The following counterfactual examples expose the flaw in LWD's argument: Suppose that Shire, instead of granting licenses to Teva and Impax and entering into a requirements contract for Adderall XR with each, decided simply to write each entity a check in consideration for their agreement to delay or drop their respective generic applications. Under *Tamoxifen* and its progeny, Shire's actions would not amount to an antitrust violation, even though the resulting price of branded Adderall XR would most likely be *higher* than what consumers currently pay because Teva and Impax would have *none* to sell (as opposed to merely having less than they were entitle to demand under their license agreements). *See Arkansas Carpenters*, 604 F.3d at 104–05 (considering the question of "whether patent settlements in which the generic firm agrees to delay entry into the market in exchange for payment fall within the scope of the patent holder's property rights, or whether such settlements are properly characterized as illegal market-sharing agreements" and noting that the Second Circuit has "held that the right to enter into reverse exclusionary payment agreements falls within the terms of the exclusionary grant conferred by the branded manufacturer's patent").

The mere fact that pricing for the public *could have been lower* under the terms of a particular settlement agreement does not mean that an antitrust violation results when that theoretical optimal result for consumers is not met. Indeed, *Tamoxifen*

and its progeny recognize the following fundamental truth that undermines LWD's claim: Where patent holders are operating within the bounds of their government-granted monopoly, consumers' rights to "optimal" pricing are severely circumscribed. *See Tamoxifen*, 466 F.3d at 216 (noting that the settlement agreement in question "almost certainly resulted in less price competition than if Barr had introduced its own generic version, of course," but that it "certainly [provided] more competition than would have occurred had there been no settlement and had Zeneca prevailed on appeal"); *see also SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1206 (2d Cir.1981) ("Where a patent in the first instance has been lawfully acquired, a patent holder ordinarily should be allowed to exercise his patent's exclusionary power even after achieving commercial success; to allow the imposition of treble damages based on what a reviewing court might later consider, with the benefit of hindsight, to be too much success would seriously threaten the integrity of the patent system.").

LWD asserts that, because Shire's decision to grant licenses to Teva and Impax diminished its patent rights, its subsequent refusal to sell Adderall XR automatically fell outside the scope of its patents, and therefore this case is best interpreted as a descendant of *Aspen Skiing* instead of a typical case involving a patent. (*See* Dkt. No. 19 at 12–14.) The Court notes the originality of this theory, but is not persuaded that it states an antitrust claim.

It is undisputed that Shire could simply have opted to offer Teva and Impax other compensation under the settlement agreements while refusing to license its patents without running afoul of antitrust laws. *See SCM Corp.*, 645 F.2d at 1209 ("With respect to [defendant's] subsequent unilateral refusal to license the ... patents, which we have held were lawfully acquired,

that conduct was permissible under the patent laws and, therefore, did not give rise to any liability under [Section] 2.") It would be a strange result indeed if Shire's decision to allow multiple licenses—thereby increasing competition—would take the patents "out of the picture," to use LWD's terminology (Dkt. No. 19 at 12), and thus increase its exposure to antitrust liability. Indeed, in *Tamoxifen*, the Second Circuit explicitly recognized the potential value of such licensing arrangements. *See* 466 F.3d at 215 ("The license ensured that money also flowed from Barr to Zeneca, decreasing the value of the reverse payment. By licensing tamoxifen to Barr, Zeneca added a competitor to the market, however limited the competition may have been.").

LWD does not allege that the scope of the licenses (or the settlement agreements as a whole, for that matter) improperly extend the scope of Shire's patents—and that is the critical inquiry in this case, regardless of Shire's alleged conduct. *See Tamoxifen*, 466 F.3d at 212–13 ("Whatever damage is done to competition by settlement is done pursuant to the monopoly extended to the patent holder by patent law unless the terms of the settlement enlarge the scope of that monopoly. 'Unless and until the patent is shown to have been procured by fraud, or a suit for its enforcement is shown to be objectively baseless, there is no injury to the market cognizable under existing antitrust law, as long as competition is restrained only within the scope of the patent.'" (*quoting In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F.Supp.2d 514, 535 (E.D.N.Y. 2005))); *Applera Corp. v. MJ Research Inc.*, No. 98 Civ. 1201, 2004 WL 5683983, at *9 (D.Conn. Dec. 17, 2004) ("Because patent owners hold a lawful monopoly over the patented technology, the starting presumption must be that the licensing of that patent right is an activity that aids rather

than impedes competition.... It is only when the patent holder exceeds the scope of that lawful patent monopoly, by conspiring with licensees to impose price restrictions on unpatented items that are not themselves subject to the patent grant, that the multiple licensing program may be deemed anticompetitive.") (internal citation omitted); *cf. Sanofi–Synthelabo v. Apotex Inc.*, No. 02 Civ. 2255, 2006 WL 3103321, at *3 (S.D.N.Y. Nov. 2, 2006) (noting that, as a general matter, "[t]he conduct of the parties during settlement negotiations in patent cases does not affect the validity of the patent") (alteration in original).

The Court is not convinced that where, as here, a patent holder granting multiple licenses that by their terms do not extend the scope of the patents in question, would nevertheless be subject to antitrust claims based on its conduct under those otherwise unchallenged licenses where that same patent holder would not face such liability if it refused outright to issue a license in the first instance. Even if Shire *completely failed* to supply Teva and Impax with Adderall XR under the terms of the license, LWD and the rest of the market would be no worse off than had Shire decided against licensing in the first place. To subject Shire to antitrust claims based on this fact pattern would have the perverse effect of *decreasing* the competition because it would incentivize patent holders to simply write checks to their potential competitors instead of allowing for more products to enter the market. *See Tamoxifen*, 466 F.3d at 226 ("If the validity of the patent is clear, and the generic company receives a license to market the patent holder's product, *competition is increased.*" (emphasis added)).

Moreover, *Aspen Skiing* is readily distinguishable, and the limitations of its holding have already been recognized. In *Verizon Communications Inc. v. Law Of-*

*fices of Curtis V. Trinko, LLP*, the Supreme Court reiterated the general principle in *Aspen Skiing* that, "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." 540 U.S. 398, 408, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004). However, it further noted that it has been "very cautious" in recognizing such liability, *id.*, and stated that "*Aspen Skiing* is at or near the outer boundary of § 2 liability," *id.* at 409, 124 S.Ct. 872; *see also Pacific Bell Tele. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 452–53, 129 S.Ct. 1109, 172 L.Ed.2d 836 (2009) (noting "the importance of clear rules in antitrust law," and recognizing the difficulties courts face in imposing duties to deal). The Second Circuit has likewise recently refused to extend *Aspen Skiing*. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir.2007) ("[B]ecause plaintiffs do not allege that defendants *terminated* any prior course of dealing—the sole exception to the broad right of a firm to refuse to deal with its competitors—the allegations are insufficient to state a unilateral-monopolization claim." (emphasis added)).

LWD can point to only two opinions from one case outside this jurisdiction, *Safeway Inc. v. Abbott Laboratories*, that apply *Aspen Skiing* to uphold a § 2 claim in a fact pattern involving drug patents. *See* Nos. C 07–05470 CW, C 07–5985 CW, C 07–6120 CW, C 07–5702 CW, 2010 WL 147988 (N.D.Cal. Jan. 12, 2010) (denying motion to dismiss); 761 F.Supp.2d 874 (N.D.Cal.2011) (denying motion for summary judgment). *Safeway* involved two drugs for the treatment of HIV marketed by Abbott: the first, Norvir, was most useful when combined as a "booster" with drugs marketed by rival companies, while the second, Kaletra, operated in the same market, but did not require another booster. *See* 2010 WL 147988 at *1–2. Plaintiffs alleged that Abbott violated § 2 by

artificially raising the wholesale price it charged on Norvir to licensees by 400% (thereby constraining its rivals who depended on it), while maintaining the cost of Kaletra. *See id.* at *1–2, *5. In denying the motion to dismiss, the court held that Abbott's 400% price increase effectively constituted a refusal to deal, and that this refusal negatively impacted the market for Kaletra by placing Abbott's competitors in the "untenable position of selling their [competing products] at a price that could not compete with Kaletra. By setting such unattractive terms, Abbott essentially refused to deal with its competitors." *Id.* at *7.

The difference in market impact between Abbott's alleged behavior in *Safeway* and Shire's alleged behavior in this case is worth highlighting. Abbott's behavior had an anticompetitive effect that Shire's could not: While Abbott's alleged malfeasance under a license agreement for Norvir had an anticompetitive effect for a *different* drug (Kaletra) by hamstringing all competitors that required Norvir, Shire's alleged refusal to deal under the Adderall XR licenses—in addition to being arguably less of a complete "refusal"—had the impact of raising the price of Adderall XR (and the generic products sold by Teva and Impax) that were nevertheless arguably still lower than if the licenses were never issued. As the United States District Court for the Northern District of Illinois recognized in a different Norvir case, the type of claims at issue in *Safeway* are significant because of how a price increase in one market affects competition in a different market. *See Schor v. Abbott Labs.*, 378 F.Supp.2d 850, 860 (N.D.Ill. 2005) (dismissing claims and holding that a "defendant may not be held liable for a violation of § 2 of the Sherman Act for increasing the price of its patented product, even though that price increase may affect competition in a second market"). Thus, neither *Safeway* nor the other refus-

al-to-deal cases cited by LWD would alter the Court's conclusion that, notwithstanding Shire's alleged conduct under the agreements, because the terms of those settlement agreements with Teva and Impax do not exceed the scope of the patents in question, LWD's claims fail. *See Arkansas Carpenters*, 604 F.3d at 106 ("[T]he only reasonable basis for distinguishing *Tamoxifen* would be if plaintiffs demonstrated that the settlement agreement here, unlike in *Tamoxifen*, exceeded the scope of [the patent in question].").

## B. *"RELEVANT MARKET" AND THE POTENTIAL APPLICATION OF ILLINOIS BRICK*

Because LWD's claim is dismissed for the reasons stated above, the Court declines to address the parties' remaining arguments regarding proper establishment of a "relevant market," or application of *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

## IV. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the motion (Dkt. No. 12) of defendants Shire LLC and Shire U.S., Inc., to dismiss the complaint of plaintiff Louisiana Wholesale Drug Company, Inc., is GRANTED.

The Clerk of Court is directed to terminate any pending motions and to close this case.

**SO ORDERED.**